1  RON BENDER (SBN 143364)
   TODD M. ARNOLD (SBN 221868)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  rb@lnbrb.com, tma@lnbrb.com; kjm@lnbrb.com

6
   Counsel for Chapter 11 Debtor and Debtor in Possession
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 LOS ANGELES DIVISION

11

12 In re:                          ) Case No. 2:09-bk-29228-ER
                                   )
13 CASTELLINO VILLAS, A K.F LLC,   ) Chapter 11
   a California limited liability  )
14 company,                        )
                                   )
15                                 ) DISCLOSURE STATEMENT DESCRIBING
                                   ) DEBTOR'S PLAN OF REORGANIZATION
16              Debtor.            ) (DATED NOVEMBER 10, 2009)
                                   )
17                                 ) Disclosure Statement Hearing:
                                   ) Date:      December 16, 2009
18                                 ) Time:      10:00 a.m.
                                   )
19                                 ) Plan Confirmation Hearing:
                                   ) Date:  [To Be Scheduled]
20                                 ) Time:  [To Be Scheduled]
                                   )
21                                 ) Place: Courtroom 1568
                                   )        255 East Temple Street
22                                 )        Los Angeles, CA 90012
                                   )
23                                 )
                                   )
24                                 )
                                   )
25

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................... 2

    A.    PURPOSE OF THIS DISCLOSURE STATEMENT ............... 3

    B.    DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN
          CONFIRMATION HEARING .............................. 4

    1.    Time and Place of the Plan Confirmation Hearing ..... 4

    2.    Deadline For Voting For or Against the Plan ......... 5

    3.    Deadline for Objecting to the Confirmation of
          the Plan .......................................... 5

    C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION
          REGARDING THE PLAN ................................ 5

    D.    DISCLAIMER ........................................ 6

II.   BACKGROUND ............................................ 6

    A.    DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS
          AND A SUMMARY OF THE CIRCUMSTANCES THAT LED TO THE
          FILING OF THE DEBTOR'S CHAPTER 11 CASE ............. 6

    B.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY ........... 12

          1. Operational Issues ............................. 12

              i.   Use of Cash Collateral .................... 12
              ii.  Emergency Motion to Provide Adequate
                   Assurance of Payment to the Debtor's
                   Utilities ................................. 15

          2. Administrative Matters ......................... 15

          3. Employment of Professionals .................... 15

          4. Litigation Matters ............................. 16

III. PLAN SUMMARY .......................................... 18

IV.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .... 19

A.   WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE
     UNDER THE PLAN .................................... 19

B.   UNCLASSIFIED CLAIMS ............................... 19

     1. Administrative Expenses ......................... 20

     2. Priority Tax Claims ............................ 22

C.   CLASSIFIED CLAIMS AND INTERESTS ................... 23

     1. Classes of Secured Claims ...................... 23

     2. Classes of Priority Unsecured Claims ........... 44

     3. Class of General Unsecured Claims .............. 44

     4. Class of Interest Holders ...................... 47

D.   MEANS OF EFFECTUATING THE PLAN AND IMPLEMENTATION
     OF THE PLAN ....................................... 48

     1.   Funding for the Plan .......................... 48

     2.   Composition of the Reorganized Debtor ......... 49

     3.   Post-Confirmation Management .................. 49

     4.   Disbursing Agent .............................. 50

     5.   Objections to Claims .......................... 50

     6.   Avoidance Actions ............................. 51

     7.   Exemption from Transfer Taxes ................. 52

     8.   Employment of Professionals By the
          Reorganized Debtor and Payment of Professional
          Fees and Expenses Incurred After the
          Effective Date ................................ 52

     9.   Distributions to be Made Pursuant to the Plan .. 52

     10.  Exculpations and Releases ..................... 53

     11.  Injunctions ................................... 53

        12. Executory Contracts and Unexpired Leases ....... 54

        13. Changes in Rates Subject to Regulatory
            Commission Approval ........................... 56

        14. Retention of Jurisdiction ...................... 56

V.    TAX CONSEQUENCES OF THE PLAN ........................... 58

VI.   CONFIRMATION REQUIREMENTS AND PROCEDURES ............... 59

      A.  WHO MAY VOTE OR OBJECT ............................ 60

      B.  WHO MAY VOTE TO ACCEPT/REJECT THE PLAN ............ 60

      C.  WHAT IS AN ALLOWED CLAIM/INTEREST ................. 60

      D.  WHAT IS AN IMPAIRED CLAIM/INTEREST. ............... 62

      E.  WHO IS NOT ENTITLED TO VOTE. ...................... 62

      F.  WHO CAN VOTE IN MORE THAN ONE CLASS. .............. 63

      G.  VOTES NECESSARY TO CONFIRM THE PLAN. .............. 63

      H.  VOTES NECESSARY FOR A CLASS TO ACCEPT THE PLAN. ... 64

      I.  TREATMENT OF NON-ACCEPTING CLASSES. ............... 64

      J.  REQUEST FOR CONFIRMATION DESPITE NONACCEPTANCE BY
          IMPAIRED CLASS(ES). ............................... 65

      K.  LIQUIDATION ANALYSIS. ............................. 65

      L.  FEASIBILITY. ...................................... 68

VII. RISK FACTORS REGARDING THE PLAN ........................ 69

VIII.EFFECT OF CONFIRMATION OF THE PLAN ..................... 70

      A.  DISCHARGE. ........................................ 70

      B.  MODIFICATION OF THE PLAN. ......................... 70

      C.  POST-CONFIRMATION STATUS REPORTS. ................. 70

      D.  POST-CONFIRMATION CONVERSION/DISMISSAL. ........... 71

E.    FINAL DECREE. ..................................... 71

## I. **INTRODUCTION**

Castellino Villas, a K.F. LLC (the "Debtor"), the Debtor
and Debtor in Possession in the above-referenced Chapter 11
bankruptcy case, is the Debtor in a pending Chapter 11
bankruptcy case. On July 24, 2009 (the "Petition Date"), the
Debtor commenced this bankruptcy case by filing a Voluntary
Petition under Chapter 11 of the United States Bankruptcy Code,
11 U.S.C. § 101 et seq. ("Bankruptcy Code"). This document is
the Disclosure Statement which describes the Debtor's Plan of
Reorganization ("Plan") that is being proposed by the Debtor.

Chapter 11 allows the Debtor, and, under some
circumstances, creditors and other parties in interest, to
propose a plan of reorganization. The Plan is a plan of
reorganization which has been proposed by the Debtor. The
effective date of the Plan (the "Effective Date") will be the
first business day which is at least eleven days following the
date of entry of the Court order confirming the Plan (the "Plan
Confirmation Order") when and provided that all of the following
conditions to the effectiveness of the Plan have been satisfied
or waived by the Debtor: (a) there shall not be any stay in
effect with respect to the Plan Confirmation Order; (b) the Plan
Confirmation Order shall not be subject to any appeal or
rehearing; and (c) the Plan and all documents, instruments and
agreements to be executed in connection with the Plan shall have

2

been executed and delivered by all parties to such documents, instruments and agreements.  The Debtor following the Effective Date shall be referred to as the "Reorganized Debtor".

**A.   Purpose of this Disclosure Statement**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

(1)   **WHO CAN VOTE OR OBJECT,**

(2)   **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

(3)   **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY CASE,**

(4)   **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

(5)   **WHAT IS THE EFFECT OF CONFIRMATION, AND**

(6)   **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to

obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

### 1. Time and Place of the Plan Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on _____, 2010, at __:__ __.m., before the Honorable Ernest M. Robles, United States Bankruptcy Judge for

4

the Central District of California, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California.

### 2. Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Krikor J. Meshefejian, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067.

Your ballot must be received by 5:00 p.m., PST, on _____, 2010 or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must, by _____, 2010, be filed with the Court and served by same day service upon Krikor J. Meshefejian, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: kjm@lnbrb.com.

### C. Identity of Persons to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Krikor J. Meshefejian, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email:

1  kjm@lnbrb.com.

2  **D.  Disclaimer**

3       The financial data relied upon in formulating the Plan is
4  based on the Debtor's books and records which, unless otherwise
5  indicated, are unaudited.   The information contained in this
6  Disclosure Statement is provided by the Debtor.   The Debtor
7  represent that everything stated in this Disclosure Statement is
8  true to the Debtor's best knowledge.   The Bankruptcy Court has
9  not yet determined whether or not the Plan is confirmable and
10 makes no recommendation as to whether or not you should support
11 or oppose the Plan.
12

13                         **II. BACKGROUND**

14 **A.  Description and History of the Debtor's Business and a**
15 **     Summary of the Circumstances that Led to the Filing of the**
16 **     Debtor's Chapter 11 Case**
17

18      The Debtor was formed for the purpose of obtaining
19 financing, developing, marketing and renting out the real
20 property located at 3300 Renwick Avenue, in Elk Grove,
21 California, upon which the Debtor built a modern 120-unit
22 apartment building commonly known as Castellino Villas (the
23 "Property").  The Property is managed by a third-party manager,
24 FPI Management, Inc. ("FPI"), which manages thousands of
25 apartment units in the Sacramento area.   The Property is

                              6

currently approximately 90% occupied and generates monthly net operating income of approximately $80,000. The Debtor has commissioned an appraisal of the Property to determine the actual fair market value of the Property. The Debtor believes that the Property has a fair market value of approximately $14 million and that the Property is not declining in value as occupancy rates and net operating income have remained steady or have improved since the Petition Date.

The Debtor is wholly owned by Campbell Corners Limited Partnership I, a Michigan limited partnership ("Campbell Corners"), which is also a chapter 11 debtor and debtor in possession in a case pending before this Court (Case No. 2:09-bk-29222-ER). In turn, Campbell Corners is owned by Siena Villas, a K.F. LLC ("Siena"), as general partner, and EL II Properties Trust u/d/t Dated July 1, 1983 (the "El II Trust"), as limited partner. Siena owns 57.07% and El II Trust owns 42.93% of Campbell Corners. In turn, Siena is owned 99% by El II Trust and 1% by Kopple Financial Inc., a California corporation. Siena is managed by Robert C. Kopple ("Kopple"), who has extensive experience in the acquisition, development and management of commercial and multi-family real property. Kopple is also the trustor, trustee and a beneficiary of the El II Trust.

7

In or about May 2004, the Debtor entered into a loan agreement with Washington Mutual, pursuant to which the Debtor obtained a loan from Washington Mutual. The Debtor subsequently refinanced the Washington Mutual loan through Bank of the West (the "Bank"). The Debtor currently owes the Bank approximately $13 million (the "Loan"), which is secured by a first trust deed against the Property.[1]

The Loan matured on March 5, 2009. From that time through the Petition Date, the Debtor paid interest only to the Bank at the original contract rate of the prime rate plus .25% (currently 3.50%), not the default contract rate (currently 8.5%). Prior to the Petition Date, the Bank commenced foreclosure proceedings against the Property.

The Property was constructed by Picerne Construction dba Camelback Construction ("Picerne") pursuant to a construction agreement entered into between the Debtor and Picerne on or about May 20, 2004. Construction commenced in or about June 2004 and was substantially completed in or about August 2006. Picerne was late in completing construction of the Property causing substantial damage to the Debtor's ability to generate income from, and obtain permanent financing for, the Property.

---

[1] In addition to the Bank's trust deed, a number of mechanic's liens actions have been recorded against the Property. One such alleged mechanic's lien (a claim of lien) has been recorded by Picerne Construction Corp. in the amount of $1,479,366.21.

8

Additionally, during the winter season of 2006, while the Property was being built, the Property was heavily damaged by a rain storm as a result of Picerne's failure to adequately safeguard the Property, thus further delaying the completion and income generation of the Property.

On or about October 10, 2006, the Debtor commenced litigation against Picerne, various subcontractors to the project, and the Debtor's risk surety which had denied the Debtor's water damage claim (the "Debtor's Complaint") in the Superior Court of California, County of Sacramento (the "Sacramento Court"), Case No. 06AS04361. The Debtor's Complaint asserted causes of action against Picerne for fraud, misrepresentation and monies due, primarily as a result of Picerne's failure to timely complete construction of the Property and Picerne's failure to maintain an active contractor's license at all times it performed work on the Property. While, as Picerne notes, the Property is in good condition and the Debtor is satisfied with the quality of the Property, the construction of the Property was substantially delayed by Picerne and that has caused a significant negative financial impact upon the Debtor.

On or about September 25, 2006, Picerne filed an arbitration demand with the American Arbitration Association against the Debtor related to the Debtor's refusal to pay

9

Picerne for work that was incorrectly and untimely performed. In lieu of arbitration, the litigation of the Debtor's Complaint in the Sacramento Court and other related litigation were stayed. On or about March 11, 2009, Picerne obtained an interim arbitration award against the Debtor. On or about May 11, 2009, Picerne obtained a final arbitration award against the Debtor. The net result of the foregoing was an award in favor of Picerne and against the Debtor for approximately $2.9 million (the "Arbitration Award"). Thereafter, Picerne filed a petition in the Sacramento Court to confirm the Arbitration Award into a judgment, Case No. 34-2009-00045395 (the "Arbitration Action"), which is one subject of Picerne's Motion. Concurrently, the Debtor moved in the Sacramento Court to vacate the Arbitration Award due to the arbitrator's failure to disclose information related to the arbitrator's affiliation with Picerne's counsel of record. Though the State Court denied the Debtor's motion to vacate the Arbitration Award, the Debtor heavily disputes the Arbitration Award on both procedural and substantive grounds and is currently analyzing its options.

While Picerne alleges in the context of the Arbitration Action that the Debtor had acted in bad faith with respect to the Debtor's refusal to make payments to Picerne, the Debtor

submits that it had bona fide reasons to withhold payments.[2]  On December 29, 2006, Picerne also filed in the Sacramento Court a complaint to foreclose upon its mechanic's lien claim, Case No. 06AS05561 (the "Foreclosure Action").

Picerne's mechanics lien is in the amount of $1,479,366.21. The Debtor is aware of an additional five mechanic liens recorded against the Property, consisting of the following: Teichert & Son, Inc. - $87,651.63; American Automatic Fire Protection Inc. - $24,639.40; Contractors Door and Millwork, Inc. - $37,899; Hemington Landscape Services, Inc. - $39,631.50; and Mitchell Jones Concrete, Inc. - $74,052.20. However, the Debtor believes that the five mechanic liens other than Picerne's are included within Picerne's mechanic lien, meaning that the total amount of mechanic lien claims is $1,479,366.21.

Because of costly litigation with Picerne, the sharp decline in the economy which has reduced the rental rates for apartments and reduced the value of apartment buildings, and the

---

[2] The Arbitrator found, for example, that "Picerne mismanaged these two construction projects by, *inter alia*; failing to immediately inspect both sets of drawings provided by the Owner; by failing to develop 'trade packages' based on those drawings; failing to timely value engineer the 'post-tensioned' slabs Picerne recommended to the Owner; not always having a Project Manager on site; improperly grading a portion of the underground utilities; failing to inspect for the sewage tie-in before digging necessitating an 80' removal of piping just recently installed; delays in ordering and installing C.O.-approved upgraded granite countertops; not having and not using standardized written policies and procedures[.]"

11

Debtor's inability to obtain permanent financing due to mechanics' liens being recorded against the Property, the Debtor was unable to meet its obligations of paying off the matured Loan to the Bank in March 2009, and the Bank commenced foreclosure proceedings against the Property.   Adding to the Debtor's financial difficulty was the entirely unexpected and heavily disputed Arbitration Award.

The impending foreclosure against the Property by the Bank coupled with the existence of the mechanics' liens recorded against the Property and the imposition of the Arbitration Award in favor of Picerne necessitated the filing of the Debtor's Chapter 11 bankruptcy case to provide the Debtor the opportunity to reorganize.

**B.   Significant Events During the Bankruptcy**

The following is a list of significant events which have occurred during the Debtor's Chapter 11 case:

**1.   Operational Issues**

**i.   Use of Cash Collateral**

The Debtor would not have been able to continue to operate, or maintain the going concern value of, the Property without the ability to use the revenue generated by the Property to pay for the operating expenses of the Property.   The Debtor therefore filed an emergency motion to use cash collateral at the outset of this case, which was approved by the Court on an emergency

12

interim basis at a hearing held on August 4, 2009. The Court scheduled a continued cash collateral hearing to be held on September 1, 2009, and ordered the Debtor to make an adequate protection payment to the Bank in the amount of $38,000 for the month of July, 2009. The Bank filed an objection to the Debtor's continued use of cash collateral. Prior to the September 1, 2009 hearing, the Debtor and the Bank entered into a stipulation to continue the September 1, 2009 hearing to provide the Debtor and the Bank with additional time to attempt to reach an agreement on a cash collateral stipulation. That continuance stipulation provided for the Debtor to make an adequate protection payment to the Bank in the amount of $38,000 for the month of August, 2009, to be paid by September 1, 2009. The Court approved the continuance stipulation and scheduled the continued cash collateral hearing for September 17, 2009.

Prior to the continued hearing, the Debtor and the Bank entered into a stipulation providing for the Debtor's continued use of cash collateral with the Bank's consent. A summary of the key provisions of that cash collateral stipulation is as follows:

1. The Debtor agreed that if it did not file any lawsuit against the Bank by November 24, 2009 challenging, among other things, the validity, extent, priority, perfection or enforceability of the Bank's liens, it will have forever waived

the right to do so in the future and will have provided the Bank a full and complete release.

2. The Bank consented to the Debtor's continued use of cash collateral to pay the Debtor's ordinary operating expenses. The Debtor is required to file a new operating budget by November 9, 2009 regarding use of cash collateral beyond November 24, 2009.

3. As adequate protection, the Debtor granted to the Bank a replacement lien in all of the Debtor's post-petition assets of the nature and type described in the Bank's loan documents and the proceeds thereof.

4. Commencing October 10, 2009, and continuing by the tenth day of each month thereafter, the Debtor agreed to pay to the Bank monthly interest on the Bank's loan at a fixed rate equal to 6% per annum (approximately $67,500 per month) as further adequate protection to the Bank.

The Court approved the cash collateral stipulation between the Debtor and the Bank at the continued hearing held on September 17, 2009 except that the Court order makes clear that except as between the Debtor and the Bank, the cash collateral stipulation is not a determination of the priority of any third party's lien(s), and is without prejudice to the right, if any, of any third party to assert priority of its lien(s) encumbering the Property in any matter before the Bankruptcy Court or any

14

other court, whether arising by adversary proceeding, contested matter or otherwise.

### ii. **Emergency Motion to Provide Adequate Assurance of Payment to the Debtor's Utilities**

At the commencement of this case, the Debtor filed an emergency motion for an order authorizing the Debtor to provide adequate assurance of future payment to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code. The Court granted the Debtor's emergency utilities motion at a hearing held on August 4, 2009.

### 2. **Administrative Matters**

The Debtor was required to address the various administrative matters attendant to the commencement of this bankruptcy case. These matters included the preparation of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, and the preparation of the materials required by the OUST, including, without limitation, the 7-Day Package. The Debtor has made every effort to comply with its duties under 11 U.S.C. Sections 521, 1106 and 1107 and all applicable OUST guidelines, including the filing of the Debtor's monthly operating reports with the OUST. The Debtor also attended its initial interview with the OUST, and the meeting of creditors required under 11 U.S.C. § 341(a).

### 3. **Employment of Professionals**

15

The Debtor has employed Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") as its bankruptcy counsel.

## 4.   Litigation Matters

Picerne filed a motion for relief from the automatic stay as to two state court actions which were pending on the Petition Date.   One is a petition filed by Picerne in the Superior Court of California, County of Sacramento (the "Sacramento Court") to reduce an arbitration award into a judgment, Case No. 34-2009-00045395 (the "Arbitration Action").   The other is a complaint in the Sacramento Court to foreclose upon a mechanic's lien claim recorded by Picerne, Case No. 06AS05561 (the "Foreclosure Action").

The Debtor did not oppose Picerne's request for the purely ministerial act of entry of judgment in the Arbitration Action. However, the Debtor did oppose any effort by Picerne to enforce such judgment upon the Debtor.   The Debtor also opposed Picerne's request for stay relief with respect to the Foreclosure Action.

At a hearing held on September 21, 2009, the Court granted Picerne's relief from stay motion to enable Picerne to obtain an entered judgment in the Arbitration Action, recognizing that Picerne does not have relief from stay to enforce any such judgment against the Debtor.   At the hearing held on September 21, 2009, the Court also granted Picerne's relief from stay

16

1 | motion to enable Picerne to proceed with the Foreclosure Action.
2 | Tecihert & Son, Inc. has also moved for relief from the
3 | automatic stay to prceed with its mechanic lien foreclosure
4 | action. The Debtor has not opposed such relief but has reserved
5 | its rights to remove that action to the Bankruptcy Court.

6 | 
7 | Picerne has orally advised the Debtor that it believes that
8 | its mechanic lien against the Property is senior in priority to
9 | the Bank's lien against the Property, and has added the Bank as
10 | a defendant in the Foreclosure Action. The Bank has orally
11 | advised the Debtor that it disputes any such contention by
12 | Picerne or any other mechanic lien holder and that the Bank
13 | believes that its lien against the Property is a first priority
14 | lien.

15 | On November 6, 2009, the Debtor removed the Foreclosure
16 | Action to the United States District Court for the Eastern
17 | District of California. The Foreclosure Action is currently
18 | pending in that District Court (Case No. 2:09-CV-03116-MCE-JFM).
19 | The Debtor intends to transfer the removed Foreclosure Action to
20 | the United States District Court for the Central District of
21 | California, for reference to the Bankruptcy Court where the
22 | Debtor's bankruptcy case is pending.[3]

23 | 
24 | 
25 | [3] The Debtor has also removed to the District Court for the Eastern District
of California, an action originally filed in the Superior Court of
California, County of Sacramento. That removed action is styled Campbell
Corners Limited Partnership, Castellino Villas a K.F. LLC v. Evanston

17

Picerne has also requested an examination of the Debtor under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

### III. **PLAN SUMMARY**

The primary initial funding for the Plan will come from a new value contribution (the "New Value Contribution") to be made by the El II Properties Trust u/d/t Dated July 1, 1983 (the "New Value Investor"). The Debtor expects that the New Value Contribution will be in the amount of approximately $2,725,000. Out of the New Value Contribution, the Reorganized Debtor will pay all allowed administrative claims, a $2.5 million cash payment to the Bank on the Effective Date, and the $100,000 contribution to class 3 claim holders. The balance of the Bank debt (i.e., the class 1 claim) will be treated in the manner described below. The six mechanic lien claims (i.e., the class 2 claims) will be treated in the manner described below. The treatment of the class 2 claims will be dependent upon three primary factors – one, the value of the Property at the time of confirmation of the Plan; two, whether the mechanic liens against the Property are senior or junior to the Bank's lien against the Property; and three, whether the mechanic lien claims are all part of Picerne's mechanic lien claim as the

Insurance Company; Picerne Construction Corp. dba Camelback Construction; CNC Contractors; CJS plumbing, Inc.; American Underlayment Systems, et al., Case No. 2:09-CV-02973-FCD-EFB. The Debtor's motion to transfer venue of that removed action to the Central District is currently pending.

Debtor believes to be the case.  As described above, the Debtor currently believes that the Property has a current fair market value of approximately $14 million.  However, this belief as to value is without the benefit of a current appraisal of the Property having been prepared.  The Debtor has commissioned a current appraisal of the Property and will file the results with the Court (and amend this Disclosure Statement as appropriate) as soon as it is completed.  General unsecured creditors (i.e., the class 3 claims) will receive the total cash sum of $100,000 to be paid on a pro rata basis.  All equity interests in the Debtor (i.e., class 4 interests) will be cancelled on the Effective Date.  All of the equity interests in the Reorganized Debtor will be issued to the New Value Investor in exchange for the New Value Contribution.

## IV. **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.    What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**B.    Unclassified Claims**

19

Certain types of claims are not placed into voting classes; instead they are unclassified.   They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.   As such, the Debtor has not placed the following claims in a class.

### 1. Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Bankruptcy Code Section 507(a)(2).   The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtor's § 507(a)(2) administrative claims and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date out of the New Value Contribution |
| Office of the United States Trustee ("OUST") Fees | $0 | Paid in full on the Effective Date out of the New Value Contribution |
| Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), bankruptcy counsel | $100,000 (est.), which would be in addition to LNBRB's pre-petition retainer | Paid in full out of the New Value Contribution on the later of the Effective Date |

| to the Debtor | balance existing on the Petition Date | and the date the Court enters an order allowing such fees and expenses |
|---|---|---|
| | | |
| **TOTAL** | $ 100,000 | |

Court Approval of Fees Required:

The Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the OUST, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan. The administrative claim amounts set forth above simply represent the Debtor's best estimates as to the amount of allowed administrative claims in this case. The actual administrative claims may be higher or lower. Whether the estimated administrative claims described above for LNBRB are ultimately the actual administrative claims for LNBRB will be dependent upon whether the Debtor is required to engage in any substantial litigation regarding the confirmation of the Plan and/or objecting to claims. To the extent the Debtor is required to engage in any such substantial

litigation, LNBRB is likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the figures set forth above. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in this case are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of the Plan.

To the extent allowed administrative claims are allowed prior to the Effective Date, such allowed administrative claims may be paid by the Debtor out of the Debtor's funds. To the extent allowed administrative claims are allowed after the Effective Date, such allowed administrative claims will be paid by the Reorganized Debtor out of its operating funds or out of the New Value Contribution.

## 2. Priority Tax Claims

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code

22

requires that each holder of such a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date.    The claims chart attached as Exhibit "1" to this the Disclosure Statement includes all priority tax claims which were either scheduled by the Debtor or asserted by the taxing agencies in filed proofs of claim.    The Debtor is not aware of any priority tax claims.

**C.    Classified Claims and Interests**

**1. Classes of Secured Claims**

Secured claims are claims secured by liens on property of the Debtor's estate.    The following charts set forth the description and treatment of each of the Debtor's secured claims.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 1 | All claims of Bank of the West (the "Bank")<br><br>Estimated claim amount is approximately $13,021,000 (excluding default interest and | Impaired; allowed claim in this class is entitled to vote on the Plan. | In full settlement and satisfaction of all of the Bank's allowed claims against the Debtor, on the Effective Date, the Bank will receive the following: (i) a cash payment from the Debtor in the amount of $2.5 million paid out of the New Value Contribution, |

| | accrued and | | and (ii) two promissory |
|---|---|---|---|
| | unpaid fees incurred by the Bank) | | notes executed by the Reorganized Debtor in favor of the Bank to replace or modify (whichever the Bank would prefer) the current promissory note from the Debtor in favor of the Bank dated on or about May 11, 2006 (the "Current Bank Note") but upon the same terms and conditions as contained in the Current Bank Note except to the extent expressly modified herein.<br><br>New Promissory Note One:<br>1. One of the new promissory notes ("New Promissory Note One") will have an initial principal balance of $8.5 million.<br>2. New Promissory Note One will accrue interest following the Effective Date at a per annum interest rate which is 2.40% in excess of the 30-day LIBOR Rate (as defined in the Current Bank Note) with a floor of 4% per annum.<br>3. By the tenth $(10^{th})$ day of each of the first sixty calendar months following the Effective Date (with the first such month to include the calendar month of the Effective |

24

Date if the Effective Date occurs before the 10th day of the month, and the first such month to include the calendar month after the month of the Effective Date if the Effective Date occurs after the 10th day of the month), the Reorganized Debtor will make an interest-only monthly payment to the Bank on account of New Promissory Note One. Unless and until the per annum interest rate under New Promissory Note One exceeds the 4% floor, the monthly payment to be made by the Reorganized Debtor to the Bank on account of New Promissory Note One will be in the amount of $28,333.

4.    All outstanding principal and interest under New Promissory Note One will be fully due and owing to the Bank on the date which is five years after the Effective Date (the "Maturity Date").

5.  The obligations of the Reorganized Debtor to the Bank under New Promissory Note One (as well under New Promissory Note Two (described below) will be secured by the same collateral which secured the Debtor's obligations to the Bank

under the Current Bank Note on the Petition Date and thereafter as set forth in the Stipulation for Interim Use of Cash Collateral and Adequate Protection filed on or about September 15, 2009 (the "Stipulation"), with such collateral to have the same lien priority which existed on the Petition Date and thereafter as set forth in the Stipulation.

6. The obligations of the Reorganized Debtor to the Bank under New Promissory Note One will be personally guaranteed by Robert C. Kopple ("Kopple") upon the same terms and conditions and to the same extent that Kopple guaranteed the Current Bank Note. Once the obligations of the Reorganized Debtor to the Bank under the New Promissory Note One have been fully satisfied, Kopple shall be deemed fully and completely released from any personal guaranty obligations to the Bank on account of New Promissory Note One.

7. The Reorganized Debtor shall have the right, but not the obligation, to prepay any portion of the outstanding balance

owing under New Promissory Note One at any time with no prepayment penalty (with the amount of the remaining monthly payments to be made under New Promissory Note One to be reduced accordingly).

New Promissory Note Two:

1. The other new promissory note ("New Promissory Note Two") will have an initial principal balance computed as $13,021,000 less $8,500,000 less $2,500,000 plus the Bank's actual third-party expenses incurred and paid by the Bank after the Petition Date related to the Debtor not to exceed $50,000 (with the initial principal balance estimated at $2,071,000).

2. New Promissory Note Two will accrue interest following the Effective Date at the fixed rate of 4% per annum and will fully amortize over a period of sixty months following the Effective Date (amounting to estimated monthly payments of approximately $38,140.62).

3. By the tenth $(10^{th})$ day of each of the

first sixty calendar months following the Effective Date (with the first such month to include the calendar month of the Effective Date if the Effective Date occurs before the 10th day of the month, and the first such month to include the calendar month after the month of the Effective Date if the Effective Date occurs after the 10th day of the month), the Reorganized Debtor will make a monthly payment to the Bank on account of New Promissory Note Two in an amount which will enable the Reorganized Debtor to pay New Promissory Note Two in full over a period of sixty months following the Effective Date with sixty equal payments (with each such monthly payment to be in the estimated amount of $38,140.62).

4. Any and all outstanding principal and interest under New Promissory Note Two will be fully due and owing to the Bank on the Maturity Date.

5. The obligations of the Reorganized Debtor to the Bank under New Promissory Note Two (as well under New Promissory Note One (described above) will

be secured by the same collateral which secured the Debtor's obligations to the Bank under the Current Bank Note on the Petition Date and thereafter as set forth in the Stipulation, with such collateral to have the same lien priority which existed on the Petition Date and thereafter as set forth in the Stipulation.

6. The obligations of the Reorganized Debtor to the Bank under New Promissory Note Two will be personally guaranteed by Kopple upon the same terms and conditions and to the same extent that Kopple guaranteed the Current Bank Note. Once the obligations of the Reorganized Debtor to the Bank under the New Promissory Note Two have been fully satisfied, Kopple shall be deemed fully and completely released from any personal guaranty obligations to the Bank on account of New Promissory Note Two.

7. The Reorganized Debtor may prepay amounts outstanding under New Promissory Note Two in whole or in part provided the Reorganized Debtor has given the Bank not less

than five Business Days prior written notice of the Reorganized Debtor's intention to make such prepayment and pays to the Bank the prepayment premium due as a result. The prepayment premium shall also be paid, if the Bank, for any other reason, including acceleration or foreclosure, receives all or any portion of principal prior to its scheduled payment date. The prepayment premium shall be equal to the present value of the product of: (i) the difference (but not less than zero) between (a) the interest rate applicable to the principal amount which is being prepaid, and (b) the return which the Bank could obtain if it used the amount of such prepayment of principal to purchase at bid price regularly quoted securities issues by the United States having a maturity date most closely coinciding with the Maturity Date and such securities were held by the Bank until the relevant Maturity Date ("Yield Rate"); (ii) a fraction, the numerator of which is the number of days in the period between the

date of prepayment and the Maturity Date and the denominator of which is 360; and (iii) the amount of the principal so prepaid. Present value under New Promissory Note Two is determined by discounting the above product to present value using the Yield Rate as the annual discount factor.

General Terms:

Other than as described above, on the Effective Date, all accrued default interest, attorneys' fees and costs and other fees and costs under the Current Bank Note will be deemed waived.

The Reorganized Debtor will execute any reasonable documents requested and prepared by the Bank to memorialize the terms of the Plan and incorporate the terms and conditions of all prior loan documentation for the Current Bank Note except to the extent that any such terms or conditions is inconsistent with any specific provision of the Plan.

The Reorganized Debtor

will obtain and/or maintain appropriate public liability insurance.

The Reorganized Debtor will obtain and/or maintain casualty insurance against all risks covered by a standard fire insurance policy, with an endorsement for extended coverage and naming the Bank as a "loss payee," in the full amount of the Property's insurable value or in the amount of the Bank's then outstanding claim, whichever is greater.

Within one hundred twenty (120) days after the end of each calendar quarter, the Reorganized Debtor shall provide the Bank with a quarterly and year-to-date operating statement with all income and expenses of the Property and a current rent roll.

Upon reasonable notice and during normal business hours, the Bank shall have the right to inspect any and/or all of the Reorganized Debtor's books and records once during any thirty (30) day period.

The Reorganized Debtor shall not directly or indirectly sell, assign, lease, convey, transfer or otherwise dispose of the Property or enter into any agreement to do any of the foregoing (except dispositions of property in the ordinary course of business) without the Bank's prior written consent.

Except as otherwise specified in the Plan, the Reorganized Debtor shall not incur, create, issue, assume or suffer to exist any new indebtedness other than usual trade debt incurred in the ordinary course of its business without the prior written consent of the Bank.

Other than liens existing against the Property on the Petition Date, the Reorganized Debtor will not create, incur, assume or suffer to exist any lien, or enter into, or make any commitment to enter into, any arrangement for the acquisition of any real property through conditional sale, lease-purchase or other title retention agreements, with

respect to any real property (except in the ordinary course of business) without the Bank's prior written consent.

Other than those existing on the Petition Date, the Reorganized Debtor will not allow or permit any occurrence of any nature whatsoever (including, without limitation, any adverse determination in any litigation, arbitration or governmental investigation or proceeding that has not been timely challenged, appealed, or otherwise disputed and reasonable progress is being made toward resolution) which could reasonably be expected to materially and adversely affect the financial condition or operations of the Reorganized Debtor, impair the ability of the Reorganized Debtor to perform its obligations under the Plan, effect the validity or enforceability of the material obligations of the Reorganized Debtor to the Bank, or the timely payment of the principal of and interest on the obligations owed to the

Bank or other amounts payable by the Reorganized Debtor hereunder.

The Plan shall be construed under and in accordance with the laws of the State of California and, except as provided for in the Plan, the Plan shall not alter or affect the Bank's rights and remedies including, without limitation, the priority of its liens and interests with respect to its collateral herein and its right to proceed with foreclosure on its collateral in the event of a default which is not timely cured.

Except to the extent expressly modified by specific provisions of the Plan, all the terms and conditions of the loan documentation between the Reorganized Debtor and the Bank including, without limitation, the personal guarantee of Kopple along with all related financial reporting requirements, shall remain in full force and effect.

Neither the Plan nor the provisions of the Plan will have any affect upon the Bank's

rights and remedies against any non-debtor guarantor or co-borrower, or such non-debtor's property, except that upon the Effective Date, the Bank agrees that it has no right to pursue any action against Kopple or his assets on account of any default which occurred under the Current Bank Note prior to the Effective Date. Likewise, no bankruptcy case filed by or against such non-debtor entity shall have any affect upon the rights, remedies or obligations created by these provisions.

**EVENTS OF DEFAULT AND REMEDIES**

1. Failure to pay any monetary payment required by the Plan when due, if such failure continues beyond five (5) business days after the Reorganized Debtors' receipt of notice of the default from the Bank, will result in the Reorganized Debtor being in default of the terms and conditions of the Plan as it relates to the Bank.

2. On any default resulting from a failure to make any

| | | | | monetary payment required by the Plan, or under the Bank's loan documents as modified by the Plan, to be made to the Bank, the Reorganized Debtor will be provided with ten (10) days written notice and an opportunity to cure such default. |
| | | | | |
| | | | | 3. The Reorganized Debtor shall be given thirty (30) business days notice of any non-monetary default with an opportunity to cure. |
| | | | | |
| | | | | 4. Any notice required to be made to the Reorganized Debtor hereunder shall be made by e-mail and first class mail to the Reorganized Debtor and its counsel of record or other counsel that the Reorganized Debtor may direct in writing. Upon the expiration of any notice of any monetary default hereunder which is not timely cured, the Bank shall be entitled to exercise any and/or all of its lien rights and remedies. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 2 | All claims which are secured by valid, properly perfected and enforceable mechanics liens against the Property ("Mechanic Lien Claims"), but only to the extent that the total amount of claims secured by liens against the Property which are senior to the liens which secure the Mechanic Lien Claims + the Mechanic Lien Claims do not exceed the fair market value of the Property.<br><br>The Debtor is aware of a total of six Mechanic Lien Claims in favor of the following parties in the following amounts: Picerne Construction Corp. ("Picerne") - $1,479,366.21; Teichert & Son, | Impaired; allowed claims in this class are entitled to vote on the Plan. | The treatment of the Mechanic Lien Claims under the Plan will depend upon whether the liens against the Property which secure the Mechanic Lien Claims are senior or junior in priority to the lien against the Property which secures the class 1 claim of the Bank.<br><br>Scenario One below describes the treatment of the Mechanic Lien Claims under the Plan if the liens against the Property which secure the Mechanic Lien Claims are junior in priority to the lien against the Property which secures the class 1 claim of the Bank.<br><br>Scenario Two below describes the treatment of the Mechanic Lien Claims under the Plan if the liens against the Property which secure the Mechanic Lien Claims are senior in priority to the lien against the Property which secures the class 1 claim of the Bank.<br><br>**Scenario One.** To the extent the fair market value of the Property at the time of confirmation of the |

Inc.           -
$87,651.63;
American
Automatic Fire
Protection Inc.
- $24,639.40;
Contractors
Door       and
Millwork,  Inc.
- $37,899;
Hemington
Landscape
Services, Inc.
- $39,631.50;
Mitchell  Jones
Concrete, Inc.
- $74,052.20.

The    Debtor
believes  that
the       five
Mechanic   Lien
Claims   other
than      the
Mechanic   Lien
Claim      of
Picerne    are
included within
the   Mechanic
Lien Claim of
Picerne and are
not in addition
to the Mechanic
Lien Claim of
Picerne,
meaning   that
the      total
amount      of
Mechanic   Lien
Claims    are
$1,479,366.21.

The  extent  to
which     the
Mechanic   Lien
Claims  are  to
be  treated  as

Plan exceeds the total
amount  of  the  class 1
claim of the Bank, the
Mechanic  Lien  Claims
will   be   considered
secured        claims
("Secured Mechanic Lien
Claims")  and  will  be
treated as follows:
1. The Secured Mechanic
Lien Claims will accrue
interest following the
Effective Date at the
non-default rate of six
percent (6%) per annum
or  such  other  market
rate  of  interest  as
determined    by    the
Court.
2. By the tenth (10th)
day of each of the
first   sixty  calendar
months  following  the
Effective Date (with
the first such month to
include  the  calendar
month of the Effective
Date if the Effective
Date occurs before the
10th day of the month,
and  the  first  such
month to include the
calendar  month  after
the   month   of   the
Effective Date if the
Effective Date occurs
after the 10th day of
the  month),  the
Reorganized Debtor will
make   an   aggregate
monthly payment to the
holders of the Secured
Mechanic Lien Claims in
an  amount  that  will
satisfy the provisions
of          Section
1129(b)(2)(A)(i) of the

secured claims under the Plan will be dependent upon the following: (i) whether the Mechanic Lien Claims are secured by valid, properly perfected and enforceable mechanics liens against the Property; (ii) whether the liens which secure the Mechanic Lien Claims are senior or junior in priority to the liens which secure the Bank's claim; and (iii) the fair market value of the Property.

Bankruptcy Code. The Debtor estimates that monthly payments computed at an annual rate of interest of six percent (6%) per annum based upon a twenty-five year amortization would satisfy the provisions of Section 1129(b)(2)(A)(i) of the Bankruptcy Code.

3.  All outstanding principal and interest owing on the Secured Mechanic Lien Claims will be fully due and owing to the holders of the Secured Mechanic Lien Claims on the date which is five years after the Effective Date.

4.  The obligations of the Reorganized Debtor under the Plan to the holders of the Secured Mechanic Lien Claims will be secured by the same collateral which secured the Debtor's obligations to the holders of the Secured Mechanic Lien Claims on the Petition Date, with such collateral to have the same lien priority which existed on the Petition Date.

5.  The Reorganized Debtor shall have the right, but not the obligation, to prepay any portion of the outstanding balance owing on account of the Secured Mechanic Lien

Claims at any time with no prepayment penalty (with the amount of the remaining monthly payments to be made to the holders of the Secured Mechanic Lien Claims to be reduced accordingly).

6. The Reorganized Debtor will deliver a written promissory note to the holders of Secured Mechanic Lien Claims on the Effective Date which will memorialize the terms of the Plan if requested to do so by the holders of Secured Mechanic Lien Claims.

Any portion of the Mechanic Lien Claims which do not constitute Secured Mechanic Lien Claims will be (i) considered non-priority general unsecured claims, (ii) included in class 3, and (iii) treated in the same manner as all other class 3 claims.

**Scenario Two.** All Mechanic Lien Claims will be considered Secured Mechanic Lien Claims and will be treated as follows:

1. The Secured Mechanic Lien Claims will accrue interest following the Effective Date at the non-default rate of the 30-day LIBOR + 1% per

annum or such other market rate of interest as determined by the Court.

2. By the tenth (10th) day of each of the first sixty calendar months following the Effective Date (with the first such month to include the calendar month of the Effective Date if the Effective Date occurs before the 10th day of the month, and the first such month to include the calendar month after the month of the Effective Date if the Effective Date occurs after the 10th day of the month), the Reorganized Debtor will make an aggregate monthly payment to the holders of the Secured Mechanic Lien Claims in an amount that will satisfy the provisions of Section 1129(b)(2)(A)(i) of the Bankruptcy Code (but not to exceed $15,000 per month). The Debtor estimates that monthly payments computed at an annual rate of interest of three percent (3%) per annum based upon a twenty-five year amortization would satisfy the provisions of Section 1129(b)(2)(A)(i) of the Bankruptcy Code.

3. All outstanding

principal and interest owing on the Secured Mechanic Lien Claims will be fully due and owing to the holders of the Secured Mechanic Lien Claims on the date which is five years after the Effective Date.

4.  The obligations of the Reorganized Debtor under the Plan to the holders of the Secured Mechanic Lien Claims will be secured by the same collateral which secured the Debtor's obligations to the holders of the Secured Mechanic Lien Claims on the Petition Date, with such collateral to have the same lien priority which existed on the Petition Date.

5.  The Reorganized Debtor shall have the right, but not the obligation, to prepay any portion of the outstanding balance owing on account of the Secured Mechanic Lien Claims at any time with no prepayment penalty (with the amount of the remaining monthly payments to be made to the holders of the Secured Mechanic Lien Claims to be reduced accordingly).

6.  The Reorganized Debtor will deliver a written promissory note to the holders of

| | | | Secured Mechanic Lien Claims on the Effective Date which will memorialize the terms of the Plan if requested to do so by the holders of Secured Mechanic Lien Claims. |
|---|---|---|---|

## 2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim.

The Debtor believes that there are no Section 507(a)(3), (4), (5), (6), or (7) priority unsecured claims. To the extent the Debtor does have any such allowed priority unsecured claims (which the Debtor does not believe will be the case), such claims will be paid in full out of the New Value Contribution on the later of the Effective Date and the date the Court enters an order allowing such priority claims.

## 3. Class of General Unsecured Claims

44

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a). The following chart identifies the Plan's treatment of the class containing all of the Debtor's non-priority general unsecured claims (see Exhibit "1" to this Disclosure Statement for detailed information about each general unsecured claim):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 3 | All general unsecured claims which are not included in any other class (including the claims of any mechanic lien holders who do not hold class 2 allowed claims)

According to the Debtor's bankruptcy schedules, there are a total of up to approximately $6,978,268 of class 3 claims, inclusive of a claim in the amount of $2,923,031 in favor of Picerne (a portion of which may be included as a class 2 Secured Mechanic Lien Claim) and a claim in the amount of $3,504,953 in favor of affiliate Campbell Corners Limited Partnership I ("Campbell Corners"). | Impaired; allowed claims in this class are entitled to vote on the Plan. | On the Effective Date, the sum of one hundred thousand dollars ($100,000) from the New Value Contribution (the "Class 3 Funds") will be placed into a segregated trust account maintained by the Reorganized Debtor.

The Class 3 Funds shall be distributed on a pro rata basis (based upon the amount of their class 3 allowed claims) to the holders of class 3 allowed claims by the later of thirty days after (i) the Effective Date, and (ii) the date of entry of a Court order resolving the final disputed class 3 claim, except that Campbell Corners voluntarily agrees not to share in the distribution of the Class 3 Funds.

Assuming the total pool of class 3 allowed claims excluding Campbell Corners' claim is approximately $3,473,315, the Debtor estimates that the distribution of the Class 3 Funds will |

A detailed claims chart showing all claims which were scheduled by the Debtor and all proofs of claim which have been filed against the Debtor is attached as Exhibit "1" to this Disclosure Statement (the "Claims Chart"). It is the Debtor's intention to update the Claims Chart prior to this Disclosure Statement hearing to indicate which claims in the Claims Chart are objectionable to the Debtor, even if the Debtor has not yet filed formal objections to those claims.

enable each holder of a class 3 allowed claim to receive a cash payment equal to approximately 2.87% of the amount of their class 3 allowed claim.

The foregoing treatment of class 3 claims shall be in full settlement and satisfaction of all class 3 claims. Holders of class 3 allowed claims will not receive any other property or distribution from the Debtor or the Reorganized Debtor other than their proportional share of the Class 3 Funds.

## 4. Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in any or all of the Debtor.

47

1 The following chart identifies the Plan's treatment of the class

2 of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 4 | All equity holders, including holders of membership interests, partnership interests, common stock, preferred stock, stock options, warrants, etc. | Impaired; holders of class 4 interests are not entitled to vote on the Plan because they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. | On the Effective Date, all class 4 interests will be deemed cancelled, terminated and extinguished and of no further force and effect and will no longer constitute an equity interest in the Debtor without the need for either the Debtor or the class 4 interest holders to take any further action. Interest holders will not receive any distribution or retain any property under the Plan on account of their equity interests in one or more of the Debtor. |

**D.   Means of Effectuating the Plan and Implementation of the Plan**

**1.   Funding for the Plan**

The Plan will be funded from the New Value Contribution to be made by the El II Properties Trust u/d/t Dated July 7, 1983

1   (the "New Value Investor") and the future cash flow generated by
2   the Property. The Debtor expects that the New Value
3   Contribution will be in the amount of approximately $2,725,000.
4   All cash payments which are requested to be made on or near the
5   Effective Date will be funded from the New Value Contribution.
6   The payments which are required to be made over time will be
7   funded from the cash flow generated by the Property. The Debtor
8   is of the belief that if the class 1 claim holder and/or the
9   class 2 claim holders do not agree to extend the terms of the
10  payout of their claims at the time of maturity, the Reorganized
11  Debtor will be able to obtain replacement financing to pay their
12  outstanding balances in full. To the extent replacement
13  financing is insufficient to pay their outstanding balances in
14  full, the New Value Investor will contribute the difference to
15  the Reorganized Debtor.

### 2. Composition of the Reorganized Debtor

On the Effective Date, all of the equity interests in the
Reorganized Debtor will be issued to the New Value Investor in
exchange for the New Value Contribution.

### 3. Post-Confirmation Management

Kopple will serve as the managing member of the Reorganized
Debtor. Kopple has substantial experience in managing and
operating real estate. Kopple will be in charge of the
Reorganized Debtor's overall business operations, finances and

49

strategic planning.   Kopple will not receive any compensation from the Reorganized Debtor unless and until the class 1 claim and class 2 claims have been paid in full.

### 4.   Disbursing Agent

The Reorganized Debtor shall serve as the disbursing agent for purposes of making all distributions required to be made under the Plan.   The Reorganized Debtor will not charge any disbursing agent fee for making such distributions.

### 5.   Objections to Claims

The Debtor or the Reorganized Debtor, as the case may be, will file objections to all claims which are inconsistent with the Debtor's books and records unless the Debtor deems the inconsistency to be insignificant.   All objections to claims must be filed within thirty (30) days following the Effective Date.   With respect to disputed claims which are not resolved prior to the Effective Date, the Reorganized Debtor will have the authority, in its sole and absolute discretion, in the reasonable exercise of its business judgment, to settle or compromise any disputed claim without further notice or Court approval.   As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan.   The Reorganized Debtor will have the authority to file any objections to claims following the confirmation of the Plan, and the Court shall

retain jurisdiction over the Debtor, the Reorganized Debtor and this case to resolve such objections to claims following the confirmation of the Plan.    Nothing contained in the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any rights of setoff or recoupment, or of any defense, the Debtor or the Reorganized Debtor may have with respect to any claim.

### 6.    Avoidance Actions

The Debtor is not aware of any payments or transfers made during the ninety-day preference period for non-insiders or the one-year period for insiders which would be avoidable as preferential, as the Debtor believes that all such payments and transfers would be subject to some form of ordinary course, contemporaneous exchange or new value defense.    The Debtor is also not aware of any fraudulent conveyances which have occurred and which need to be avoided.    All claims, causes of action and avoidance actions of the Debtor and its estate are preserved by the Plan, and the Reorganized Debtor shall have full power and authority to settle, adjust, retain, enforce or abandon any claim, cause of action or avoidance actions as the representative of the Debtor's estate under section 1123(b) of the Bankruptcy Code or otherwise, regardless of whether such claims, causes of action or avoidance actions were commenced prior or subsequent to the Effective Date.

### 7.    Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax.  The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes.

### 8.    Employment of Professionals By the Reorganized Debtor and Payment of Professional Fees and Expenses Incurred after the Effective Date

The Reorganized Debtor shall have the authority to employ professionals as the Reorganized Debtor deems appropriate and to pay the fees and expenses incurred by such professionals without any further order of the Court.

### 9.    Distributions to be Made Pursuant to the Plan

Except as otherwise agreed to by the Reorganized Debtor in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a proof of claim duly filed with the Bankruptcy Court, to such address.

Checks issued to pay allowed claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.

## 10.  Exculpations and Releases

To the maximum extent permitted by law, neither the Debtor, nor the Reorganized Debtor, nor any of their employees, officers, directors, shareholders, agents, members, representatives, or professionals employed or retained by any of them, whether or not by Bankruptcy Court order, shall have or incur liability to any person or entity for any act taken or omission made in good faith in connection with or related to the formulation and implementation of the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.

## 11.  Injunctions

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.  Except as provided in the Plan or the Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or

other debt or liability that is discharged or an interest or other right of an equity security holder that is extinguished pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, or their property on account of any such discharged claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan. By accepting distribution pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section.

## 12. Executory Contracts and Unexpired Leases

On the Effective Date, all of the Debtor's remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtor and which are identified in Exhibit "2" to this Disclosure Statement shall be

deemed to be assumed by the Debtor and to become valid and binding executory contracts and unexpired leases of the Reorganized Debtor (the "Debtor's Assumed Contracts and Leases"). By 5:00 p.m. PST on the day prior to the date of the Plan confirmation hearing, the Debtor shall file a pleading with the Court identifying all of the Debtor's Assumed Contracts and Leases. All of the Debtor's remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtor and which are not included among the Debtor's Assumed Contracts and Leases shall be deemed rejected effective as of 11:59 PST on the Plan Effective Date. With respect to all of the Debtor's Assumed Contracts and Leases for which a default exists on the Effective Date, the Debtor will be required to (a) cure or provide adequate assurance that the Reorganized Debtor will promptly cure any default existing under any such executory contracts and unexpired leases, (b) compensate or provide adequate assurance that the Reorganized Debtor will promptly compensate any other party to such executory contracts and unexpired leases for any actual pecuniary loss to such parties resulting from any default existing under any such executory contracts and unexpired leases, and (c) provide adequate assurance of future performance under such executory contracts and unexpired leases. **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM**

**THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE PLAN EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE EFFECTIVE DATE.** Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

**13. Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of its rates.

**14. Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

i. To resolve any and all disputes regarding the operation and interpretation of the Plan and the Plan Confirmation Order;

ii. To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, or by other parties in interest with standing to bring such objection or proceeding and to consider any objection to claim or interest whether such objection is filed before or after the Effective Date;

iii. To determine the extent, validity and priority of any lien asserted against property of the Debtor or property of the Debtor's estate;

iv. To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto;

v. To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi. To determine any request for payment of administrative expenses;

vii. To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

viii. To determine all applications, motions, adversary proceedings, contested matters, and any other

litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date including avoidance causes of action;

ix. To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

x. To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

xi. Except as otherwise provided in the Plan or the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xii. To issue such orders in aid of consummation of the Plan and the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiii. To enter a final decree closing this Chapter 11 case.

## V. **TAX CONSEQUENCES OF THE PLAN**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action. The Debtor does not believe that there will be any negative tax consequences to the Debtor resulting from the confirmation of the Plan.

## VI. **CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

## A.  Who May Vote or Object

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

## B.  Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

## C.  What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either

overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT OF PRE-PETITION CLAIMS IS _____ . A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

A detailed claims chart is attached hereto as Exhibit "1". The claims chart identifies all claims which were scheduled by the Debtor, including the amounts and priorities of the claims and whether the Debtor contends that the claims are disputed, contingent or unliquidated. The claims chart also identifies all proofs of claim which were filed by creditors asserting claims against the Debtor, including the amounts and priorities of the claims asserted. Finally, the claims chart indicates whether the Debtor has disputed or presently disputes any portion of the claims. The Debtor reserves the right to update and modify the claims chart at any time and to file objections to claims even if the claims chart does not identify any dispute relating to a particular claim.

**D.    What Is an Impaired Claim/Interest.**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is impaired under the Plan.    A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Debtor believes that members of classes 1, 2, 3, and 4 are impaired.  Members of classes 1, 2 and 3 are entitled to vote to accept or reject the Plan.  Members of class 4 are deemed to reject the Plan because they receive no distribution under the Plan, and, therefore, are not entitled to vote on the Plan.    Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor have incorrectly characterized the class.

**E.    Who Is Not Entitled to Vote.**

The following four types of claims are not entitled to vote:    (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under

62

the Plan.   Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.   EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**F.    Who Can Vote in More Than One Class.**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**G.    Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the

Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

**H.   Votes Necessary for a Class to Accept the Plan.**

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on the plan, voted in favor of the plan.   A class of interests is considered to have "accepted" a plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted on the plan, voted to accept the plan.

**I.   Treatment of Non-accepting Classes.**

As noted above, even if all impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.   The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."   The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**J.   Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The Debtor will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan.

**K.   Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed

unsecured claims.  Finally, interest holders receive the balance

that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court

must find that all creditors and interest holders who do not

accept the Plan will receive at least as much under the Plan as

such holders would receive under a Chapter 7 liquidation of the

Debtor.  The Debtor maintains that this requirement is clearly

met.

The impaired classes under the Plan consist of class 1 (the

Bank), class 2 (Mechanic Lien Claims), class 3 (general

unsecured creditors), and class 4 (Interests).  The Debtor must

therefore satisfy the "best interest of creditors test" with

respect to members of classes 1, 2 and 3 who do not vote to

accept the Plan and with respect to class 4 (which is deemed to

have rejected the Plan).

Given that the only tangible asset of this estate is the

Property, in a Chapter 7 liquidation of the Debtor, either the

Bank would foreclose on the Property or the Chapter 7 trustee

would sell the Property.  Even if a Chapter 7 trustee could sell

the Property for the same value that the Property is worth, the

Chapter 7 trustee would then be entitled to be paid a

substantial fee as dictated by Section 326 of the Bankruptcy

Code.  Since it is the value of the Property and the priority of

their liens that is dictating the value of the distribution to

members of classes 1 and 2 under the Plan, those two facts would be unchanged in a Chapter 7 liquidation of the Debtor except that in a Chapter 7 liquidation there would be less money for creditors because the Chapter 7 trustee and his/her professionals would be paid out of the sale proceeds. As a result, by definition, holders of claims in classes 1 and 2 would receive in a Chapter 7 liquidation of the Debtor the same or less value than they will receive under the Plan.

While the Debtor does not yet have a completed appraisal of the Property, the Debtor believes that it is clear that the value of the Property is less than the total amount of the class 1 and class 2 claims. As a result, the Debtor believes that it is clear that in a Chapter 7 liquidation of the Debtor, members of class 3 would not receive any distribution. Since members of class 3 will receive a pro rata share of $100,000 under the Plan, the Debtor believes that it is clear that members of class 3 will receive more under the Plan than they would receive in a Chapter 7 liquidation of the Debtor.

In a chapter 7 liquidation of the Debtor, holders of class 4 interests would receive no distribution. Under the Plan, holders of class 4 interests also will not receive any distribution. Holders of class 4 interests will therefore receive *not less* under the Plan than they would receive in a Chapter 7 liquidation of the Debtor.

The Debtor has therefore satisfied the "best interests of creditors test" with respect to any class 1, class 2 or class 3 claim holder who votes against the Plan and with respect to class 4 interests. The Debtor contends that the Plan provides fair and equitable treatment of all classes of creditors and the greatest feasible recovery to all creditors.

**L.   Feasibility.**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date to pay all of the claims and expenses which are entitled to be paid on such date. Prior to the Plan confirmation hearing, the New Value Investor will deposit the entire amount of the New Value Contribution into a segregated trust account maintained by LNBRB which will eliminate any doubt whatsoever as to the first aspect of Plan feasibility.

The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required Plan payments. Attached as Exhibit "3" to this

Disclosure Statement are cash flow projections prepared on an annual basis for the five-year period following the Effective Date, which demonstrate the ability of the Reorganized Debtor to make all of the Plan payments which are required to be made over time. The Reorganized Debtor will need to obtain replacement financing at the end of five years unless the holders of class 1 and class 2 claims agree to extensions of their repayment period.

## VII. RISK FACTORS REGARDING THE PLAN

As described above, there is no risk to the Debtor's ability to satisfy the first aspect of Plan feasibility because the New Value Investor will have already deposited the entire amount of the New Value Contribution into a segregated trust account maintained by LNBRB prior to the Plan confirmation hearing. Based upon the current and projected cash flow of the Property, the Debtor also believes that the Reorganized Debtor will be able to make all post-confirmation payments required to be made to the class 1 and class 2 claim holders, and then obtain replacement financing at the end of five years to pay in full all remaining outstanding balances owing to the class 1 and class 2 claim holders.

The primary risk to the ultimate financial success of the Reorganized Debtor will be the Reorganized Debtor's ability to maintain the performance of the Property and to make all such

1  post-confirmation payments, and then to obtain the necessary

2  replacement financing at the end of five years. However, based

3  upon the projected value of the Property at the end of five

4  years, the Debtor is optimistic about the ability of the

5  Reorganized Debtor to accomplish the foregoing.

## VIII. **EFFECT OF CONFIRMATION OF THE PLAN**

### A.   Discharge.

The Debtor will receive a discharge under the Plan pursuant to and in accordance with the provisions of Section 1141 of the Bankruptcy Code because there has not been a liquidation of all or substantially all of the property of the Debtor's estate and because the Reorganized Debtor will be continuing with the Debtor's current business operations.

### B.   Modification of the Plan.

The Debtor may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or re-voting on the Plan if the Debtor modify the Plan before confirmation. The Debtor may also seek to modify the Plan at any time after confirmation of the Plan so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.   Post-Confirmation Status Reports.

70

Until a final decree closing the Debtor's Chapter 11 case is entered, the Reorganized Debtor shall file a quarterly status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.

**D.    Post-Confirmation Conversion/Dismissal.**

A creditor or any other party in interest may bring a motion to convert or dismiss the case under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan.   If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Debtor's Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.   The Plan Confirmation Order may also be revoked under very limited circumstances.   The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

**E.    Final Decree.**

NOV.13'2009 12:23                                    #4692 P.003/003

1       Once this estate has been fully administered as referred to

2   in Bankruptcy Rule 3022, the Reorganized Debtor shall file a

3   motion with the Court to obtain a final decree to close this

4   case.   The Reorganized Debtor shall be responsible for the

5   timely payment of all fees incurred pursuant to 28 U.S.C.

6   Section 1930(a)(6).

7   Dated: November 13, 2009

8   Presented By:

9   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

10

11  By: _/s/ Ron Bender_____

12      RON BENDER
        Attorneys for Chapter 11

13      Debtor and Plan Proponent

14  CASTELLINO VILLAS, a/K.F./ LLC

15  a California limited liability company

16

17  ROBERT G. KOPPLE
    Authorized Representative

18

19

20

21

22

23

24

25

72

E  'd    9811 'oN                              Wd8�ㄣ:ε  6002 'ε1 'ᴧoN

# EXHIBIT 1

**CASTELLINO VILLAS**

| Creditor | Claim No | Date Claim Filed | Secured (Filed) | Priority (Filed) | General Unsecured (Filed) | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | C/U/D | Basis of Objection, If Any | Secured Amount (if all mechanic lien claims fully secured) | Priority Amount (if all mechanic lien claims fully secured) | Unsecured Amount (if all mechanic lien claims fully secured) | Secured Amount (if all mechanic lien claims fully unsecured) | Priority Amount (if all mechanic lien claims fully unsecured) | Unsecured Amount (if all mechanic lien claims fully unsecured) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Pneumatic Fire Protection Inc. | | | | | | $24,638.40 | | | C | In review | $24,638.40 | | | | | $24,638.40 |
| Bank of the West | | | | | | $13,021,739.06 | | | C | In review | $13,021,739.06 | | | $13,021,739.06 | | |
| | | | | | | $37,899.00 | | | C | In review | $37,899.00 | | | | | $37,899.00 |
| | | | | | | $39,631.50 | | | C | In review | $39,631.50 | | | | | $39,631.50 |
| | | | | | | $74,052.20 | | | C | In review | $74,052.20 | | | | | $74,052.20 |
| | | | | | | $1,479,366.21 | | | C | In review | $1,479,366.21 | | | | | $1,479,366.21 |
| Renshaw & Son, Inc. | | | | | | $87,651.63 | | | C U D | In review | $87,651.63 | | | | | $87,651.63 |
| AAA Automatic Asphalt | | | | | | | | $739.80 | C | In review | | | $739.80 | | | $739.80 |
| Avalanche | | | | | | | $0.00 | $6,920.75 | C | In review | | $0.00 | $6,920.75 | | $0.00 | $6,920.75 |
| Arizona Sales Tax | | | | | | | $0.00 | $29.40 | C | | | $0.00 | $29.40 | | $0.00 | $29.40 |
| | | | | | | | $0.00 | $570.00 | C | | | $0.00 | $570.00 | | $0.00 | $570.00 |
| Electric | | | | | | | | $4.41 | C | In review | | | $4.41 | | | $4.41 |
| Nerd Painting | | | | | | | | $20,576.25 | C | In review | | | $20,576.25 | | | $20,576.25 |
| Cabinets | | | | | | | | $5,646.90 | C | In review | | | $5,646.90 | | | $5,646.90 |
| American Development | | | | | | | | $13,237.00 | C | In review | | | $13,237.00 | | | $13,237.00 |
| Construction | | | | | | | | $4,829.40 | C | In review | | | $4,829.40 | | | $4,829.40 |
| Blooms Galore | | | | | | | | $126.89 | C | In review | | | $126.89 | | | $126.89 |
| Pest | | | | | | | | $747.20 | C | In review | | | $747.20 | | | $747.20 |
| BSI Building Products | | | | | | | | $5,477.76 | C | In review | | | $5,477.76 | | | $5,477.76 |
| Rosenberg & Hughes LLP | | | | | | | | $4,335.00 | C | In review | | | $4,335.00 | | | $4,335.00 |
| C&R Landscape | | | | | | | | $1,400.00 | C | | | | $1,400.00 | | | $1,400.00 |

**CASTELLINO VILLAS**

| Creditor | Claim No. | Date Claim Filed | FILED CLAIM — Secured | Priority | General Unsecured | SCHEDULED CLAIM — Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | C/U/D | OBJECTION — Basis of Objection, If Any | SCENARIO IF ALL MECHANIC LIEN CLAIMS ARE FULLY SECURED CLAIMS — Secured Amount | Priority Amount | Unsecured Amount | SCENARIO IF ALL MECHANIC LIEN CLAIMS ARE FULLY UNSECURED CLAIMS — Secured Amount | Priority Amount | Unsecured Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Campbell | | | | | | | | $3,504,953.31 | C | In review | | | $3,504,953.31 | | | $3,504,953.31 |
| Owners Limited Commercial | | | | | | | | | | | | | | | | |
| Crop Pest Control | | | | | | | | $160.00 | | | | | $160.00 | | | $160.00 |
| J&S Plumbing | | | | | | | | $90,436.00 | C | In review | | | $90,436.00 | | | $90,436.00 |
| C&C Contractors, Inc. | | | | | | | | $59,378.07 | C | In review | | | $59,378.07 | | | $59,378.07 |
| County of Sacramento | | | | | | | | $6,639.61 | | | | | $6,639.61 | | | $6,639.61 |
| | | | | | | | | $4,200.30 | C | In review | | | $4,200.30 | | | $4,200.30 |
| Germany | | | | | | | | $3,636.26 | C | In review | | | $3,636.26 | | | $3,636.26 |
| Delta Building | | | | | | | | $7,666.50 | C | In review | | | $7,666.50 | | | $7,666.50 |
| | | | | | | | | $2,683.20 | C | In review | | | $2,683.20 | | | $2,683.20 |
| | | | | | | | | $11,465.30 | C | In review | | | $11,465.30 | | | $11,465.30 |
| | | | | | | | | $1,424.80 | C | In review | | | $1,424.80 | | | $1,424.80 |
| Carpet | | | | | | | | $575.00 | | | | | $575.00 | | | $575.00 |
| Pool | | | | | | | | $518.90 | | | | | $518.90 | | | $518.90 |
| | | | | | | | | $19.79 | | | | | $19.79 | | | $19.79 |
| Elgin Range | | | | | | | | $42,019.50 | C | In review | | | $42,019.50 | | | $42,019.50 |
| For Rent Magazine | | | | | | | | $1,784.60 | | | | | $1,784.60 | | | $1,784.60 |
| Griffin Electric | | | | | | | | $242.50 | | | | | $242.50 | | | $242.50 |
| General Cleaning | | | | | | | | $450.00 | | | | | $450.00 | | | $450.00 |
| Harris, Rosales & Harris | | | | | | | | $795.00 | | | | | $795.00 | | | $795.00 |
| Howard Rice | | | | | | | | $28,625.01 | C | In review | | | $28,625.01 | | | $28,625.01 |
| Charpie Falk & Light Bulbs Plus | | | | | | | | $50.90 | | | | | $50.90 | | | $50.90 |
| Miller Starr Regalia | | | | | | | | $19,147.92 | C | In review | | | $19,147.92 | | | $19,147.92 |

Page 2 of 3

| Creditor | Claim No. | Date Claim Filed | Secured | Priority | General Unsecured | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | C/U/D | Basis of Objection, If Any | Secured Amount | Priority Amount | Unsecured Amount | Secured Amount | Priority Amount | Unsecured Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vocal Direct Marketing | | | | | | | | $4,585.94 | | | | | $4,585.94 | | | $4,585.94 |
| OJV Street | | | | | | | | $4,707.90 | C | In review | | | $4,707.90 | | | $4,707.90 |
| Wisat & Rain | | | | | | | | | | | | | | | | |
| Waters | | | | | | | | | | | | | | | | |
| Wi-Site Com. | | | | | | | | $163.52 | | In review | | | $163.52 | | | $163.52 |
| Weyhrmeyer | 2 | 9/15/09 | | | $66.58 | | | $66.58 | | In review | | | $66.58 | | | $66.58 |
| ...pcco | | | | | | | | $50,422.00 | C/U/D | In review | | | $50,422.00 | | | $50,422.00 |
| | | | | | | | | $2,923,031.00 | C | In review | | | $2,923,031.00 | | | |
| Pacific Decorative Concrete | | | | | | | | $137.26 | | In review | | | $137.26 | | | $137.26 |
| Pacific Gas & Electric | 1 | 9/11/09 | | | $1,218.50 | | | $328.10 | C | In review | | | $1,218.50 | | | $1,218.50 |
| | | | | | | | | $1,391.90 | C | In review | | | $1,391.90 | | | $1,391.90 |
| Red.com | | | | | | | | $618.00 | C | In review | | | $618.00 | | | $618.00 |
| | | | | | | | | $89,797.00 | C | In review | | | $89,797.00 | | | $89,797.00 |
| | | | | | | | | $19,092.80 | C | In review | | | $19,092.80 | | | $19,092.80 |
| | | | | | | | | $3,227.90 | C | In review | | | $3,227.90 | | | $3,227.90 |
| Security Services | | | | | | | | $50.00 | C | In review | | | $50.00 | | | $50.00 |
| Mud | | | | | | | | $746.01 | C | In review | | | $746.01 | | | $746.01 |
| Intec | | | | | | | | $5,452.05 | C | In review | | | $5,452.05 | | | $5,452.05 |
| Supples / Business | | | | | | | | $205.25 | C | In review | | | $205.25 | | | $205.25 |
| Sacramento | | | | | | | | $4,257.90 | C | In review | | | $4,257.90 | | | $4,257.90 |
| SkyWorld | | | | | | | | $370.00 | C | In review | | | $370.00 | | | $370.00 |
| United States Post Office | | | | | | | | $15,882.00 | C | In review | | | $15,882.00 | | | $15,882.00 |
| Valley Stairway | | | | | | | | $2,222.30 | C | In review | | | $2,222.30 | | | $2,222.30 |
| Casten Shower Doors | | | | | | | | | | | | | | | | |
| **TOTAL:** | | | $0.00 | $0.00 | $1,285.08 | $14,764,979.00 | $0.00 | $6,978,268.64 | | | $14,764,979.00 | $0.00 | $6,978,169.04 | $13,021,739.06 | $0.00 | $8,722,388.98 |

# EXHIBIT 2

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Management Agreements

1.    Management Agreement For Castellino Villas, by and between Castellino Villas, a KF LLC, a California limited liability company and FPI Management, Inc., dated September 1, 2006.

### Vendor Agreements

The Debtor is a party to contracts with the following parties which provide the Debtor with certain services related to the operation of the Debtor's Property:
   1.    Chips Pest Control
   2.    Allied Waste
   3.    Rent.com
   4.    For Rent Magazine
   5.    Everclear Pools
   6.    C&R Landscape

### Leases of Apartment Units

The Debtor is currently the lessor to approximately 111 leases of apartment units.

# EXHIBIT 3

**[CASH FLOW PROJECTIONS TO BE FILED]**